1

2

3

4

5

6

7

8

9           IN THE UNITED STATES DISTRICT COURT

10             FOR THE DISTRICT OF OREGON

11                  PORTLAND DIVISION

12 JARVIS RAY CAMPBELL,            )
                                   )
13              Plaintiff,         )
                                   )    No.  CV-10-242-HU
14       v.                        )
                                   )
15 KNIFE RIVER CORPORATION -       )
   NORTHWEST, an Oregon            )
16 corporation, dba KNIFE RIVER    )    OPINION & ORDER
   an MDU RESOURCES COMPANY,       )
17                                 )
                Defendant.         )
18 ──────────────────────────────  )

19 Kevin T. Lafky
   Haley Percell
20 LAFKY & LAFKY
   429 Court Street NE
21 Salem, Oregon 97301

22       Attorneys for Plaintiff

23 Jens Schmidt
   Kate G. Watkinson
24 HARRANG LONG GARY RUDNICK, P.C.
   360 East 10th Avenue, Suite 300
25 Eugene, Oregon 97401-3273

26       Attorneys for Defendant

27 HUBEL, Magistrate Judge:

28       Plaintiff  Jarvis  Ray  Campbell  brings  this  employment

1 - OPINION & ORDER

discrimination case against his former employer defendant Knife River Corporation.  Specifically, he brings claims under 42 U.S.C. § 1981, Title VII, 42 U.S.C. § 2000e-3(a), and Oregon Revised Statute § (O.R.S.) 659A.030.

Defendant moves for summary judgment on all of plaintiff's claims.  Both parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c).  I grant the motion in part and deny it in part.

BACKGROUND

Knife River Corporation is in the construction business and operates from multiple locations in Oregon providing aggregate, asphalt, building materials, construction services, and ready mix concrete for customers in both the public and private sectors.

Plaintiff Campbell began working at defendant's ready mix facility in Linnton in January 2006.  He was a ready mix concrete truck driver, supervised by Jim Dumolt.  Kermit Achenbach became plaintiff's supervisor in spring 2007, after Dumolt retired.

In March 2007, during a lunch break, plaintiff complained to Don Kincaid, defendant's Metro Ready Mix Operations Manager, that he thought Achenbach was treating him unfairly by making him work later than less senior drivers.  Pltf Depo. at pp. 105, 108. Plaintiff's understanding was that as a more senior driver, he should have been asked if he wanted to work late rather than being required to do so.  Id.; see also Gray Depo. at p. 13 (noting that depending on the day, the dispatch, and the orders, "if there was two people available to take it, they would ask the most senior person if they wanted to take that cleanup . . . .").  Plaintiff

2 - OPINION & ORDER

1  did not tell Kincaid that he believed Achenbach was discriminating
2  against him because of his race.

3       According to plaintiff, Achenbach explained that rather than
4  rely on seniority, he relied on a "first in, first out" rule in
5  deciding which drivers would go home first, meaning if the driver
6  was in early, he or she left early. Id. at pp. 112-13. Achenbach
7  explained to plaintiff that he sent drivers junior to plaintiff
8  home earlier because he believed plaintiff had arrived later to
9  work than those junior drivers. Id.

10      In June 2007, a newer truck with an automatic transmission
11 became available and Kincaid assigned it to Peter Nontavarnit, who
12 was junior to plaintiff in seniority. Pltf Depo. at p. 162.
13 According to plaintiff, other drivers from other plants told him
14 the truck should be passed down by seniority, with the senior
15 person being given the opportunity to have the truck. Id. Even
16 though plaintiff did not want a truck with automatic transmission,
17 he believes the use of it should have been offered to him. Id.

18      Kincaid states he assigned the truck to Nontavarnit because
19 Nontavarnit's overall job performance was better. Kincaid Declr.
20 at ¶ 4. He cites plaintiff's failure to keep his truck clean to
21 company standards, as an example. Id. He affirmatively states he
22 did not make his decision based on plaintiff's race or color. Id.

23      Plaintiff, however, states that Nontavarnit also had a dirty
24 truck. Plaintiff denies that the failure to keep his truck clean
25 was the reason Nontavarnit was offered the truck. Plaintiff cites
26 to Kincaid's deposition where Kincaid states that he had talked to
27 at least three employees, including Nontavarnit, about "cleaning up
28 their trucks[.]" Kincaid Depo. at p. 35. Kincaid also spoke to

3 - OPINION & ORDER

plaintiff.  Id. at pp. 35-36.  There is no timeframe indicated in the cited deposition testimony.

In August 2007, another African-American employee at the Linnton site, David Grimmett[1], complained to defendant's Human Resources Director Sarah Stevens (formerly Sarah La Chappelle), about the use of the word nigger at the Linnton plant.  Stevens interviewed plaintiff as part of that investigation.  At the time, plaintiff made no complaint to Stevens of any race-based discrimination directed toward him.

Also in August 2007, Kincaid assigned Nontavarnit to an open back-up "batch operator" position because, according to Kincaid, he believed Nontavarnit would be willing to fulfill the responsibilities of the position which required working late regularly, and plaintiff had never expressed interest in it. Kincaid Declr. at ¶ 5.  The job was assisting Achenbach with the "batching" when Achenbach could not do it.  Plaintiff believes it should have been offered to him because he had more seniority than Nontavarnit.  Pltf Depo. at p. 177.  Plaintiff states that contrary to Kincaid's statement, he expressed interest in the position to Dumolt, and then Achenbach, when Achenbach replaced Dumolt as plaintiff's direct supervisor.  See Pltf Depo. at pp. 178-80 (plaintiff testified that he was intrigued by learning how to "batch," that Dumolt had "showed me a couple of times on the eagle," and that it was something he was interested in, but not

---

[1] Grimmett is also a plaintiff in a case against defendant. That case, pending in this Court and assigned civil case number CV-10-241-HU, is a companion case with the instant case, but has not been consolidated.  They remain separate cases and I treat them separately.

1  directly stating that he expressed interest in this position to
2  Dumolt or to Achenbach after Dumolt retired).

3       On September 7, 2007, Achenbach reported plaintiff as late.
4  Pltf Depo. at pp. 85-86; Pltf Exh. 9 at p. 12.  On Kincaid's
5  advice, Achenbach suspended plaintiff for the rest of the day, and
6  through September 10, 2007.  Pltf Exh. 9 at p. 12.  Plaintiff
7  received a written warning from Kincaid, noting plaintiff's history
8  of tardiness, including a prior oral warning and a prior written
9  warning.  Id.  In his deposition, plaintiff states that he did not
10 believe the action was fair because other employees, whom he named
11 as "Peter, Carl, Chris Mikkotis," also came in late and Achenbach
12 did not report them or send them home.  Pltf Depo. at pp. 83, 85-
13 86.

14      In about the December 2007 time frame, plaintiff's co-worker
15 Sam Castillo told plaintiff that a month or two earlier, likely in
16 October or November 2007, Castillo overheard Achenbach refer to
17 plaintiff as "stupid fucking nigger" in regard to plaintiff's
18 driving of the truck on a particular morning.  Pltf Depo. at pp.
19 181-82.  Plaintiff explained that because Achenbach had not said
20 this to plaintiff's face, and plaintiff did not learn of it until
21 a month or two after it occurred, he did not complain about it to
22 Achenbach, Stevens, or Brian Gray, defendant's Metro Vice-President
23 - General Manager.  Id. at pp. 182-83.

24      On March 21, 2008, plaintiff became the most senior driver at
25 the Linnton site when Joe Robertson, the then-senior driver, was
26 fired.  Pltf Depo. at pp. 159-60.  Plaintiff contends that a newer
27 truck was available which, as with the one before, was supposed to
28 pass by seniority to plaintiff, but instead, the newer truck was

5 - OPINION & ORDER

1  given to Mikkotis, a less senior, Caucasian driver.  Id.  Defendant

2  notes that as with the previous truck, plaintiff did not actually

3  want this new truck.  Pltf Depo. at pp. 163-65.  Plaintiff,

4  however, states that he wanted to be offered it, even if he were to

5  decline it.  Id.

6      In July 2008, plaintiff saw two pictures of then-presidential

7  candidate Barack Obama in the office at the Linnton site.  Id. at

8  pp. 166-72.  One was a picture of a monkey with Obama's face on it,

9  and the other was a picture of Obama in traditional Middle Eastern

10 clothing, with a caption asking "do you want this to be your

11 president."  Id. at p. 167.  Two and one-half hours after he saw

12 them, the pictures were gone.  Id. at pp. 170-71.  Plaintiff did

13 not report the incident, or complain, to Achenbach, Kincaid, Gray,

14 or Stevens.  Id. at pp. 171-72.

15     In September 2009, Susan Erwin, a Linnton co-worker, used the

16 term "nigger-rigged" in the presence of plaintiff and three other

17 co-workers in describing a piece of malfunctioning equipment.  Pltf

18 Depo. at pp. 213-18.  Plaintiff did not complain to Stevens,

19 Kincaid, Gray, or anyone else in management.  Id.

20     On October 2, 2009, Achenbach sent plaintiff home from work

21 because Achenbach thought plaintiff had arrived late to work.  Pltf

22 Depo. at p. 197.  According to plaintiff, Achenbach had said

23 something like "you're not working today or tomorrow, don't even

24 come in and go to work, I'm sending you home."  Id.  Thus,

25 plaintiff did not return to work until Monday, October 5, 2009.

26 Id. at p. 198.

27     Plaintiff later complained to Kincaid and Gray that he

28 believed Achenbach disciplined him because of his race.  Kincaid

6 - OPINION & ORDER

1    asserts this was the first complaint by plaintiff of any race-based
2    discrimination toward him.   Kincaid Declr. at ¶ 6.   Plaintiff
3    confirmed in deposition that October 30, 2009, was probably the
4    first time that he brought his concerns about race discrimination
5    to Gray and Kincaid.  Pltf Depo. at p. 221.

6        Gray investigated Achenbach's decision to send plaintiff home
7    for arriving late to work.  He determined that Achenbach acted
8    outside of his authority, and disciplined Achenbach as a result,
9    including suspending him for three days and stripping him of
10   supervisory responsibilities.  He also determined that plaintiff
11   was entitled to be paid for October 2 and 3, 2009, because
12   Achenbach should not have sent plaintiff home.  Plaintiff accepted
13   a check for those wages.  Gray Depo. at pp. 14-21, 24; Deft Exh. 4
14   at pp. 1-4, 9; Pltf Depo. at pp. 205-06.

15       Gray also investigated plaintiff's allegation that Achenbach
16   disciplined him on account of his race.  Gray interviewed sixteen
17   employees who worked at the Linnton facility, including plaintiff.
18   Gray Depo. at pp. 15-16; Deft Exh. 4 at pp. 1-4.  According to
19   Gray, the interviews revealed a pattern of tardiness and lack of
20   enforcement of scheduled start times, but no evidence of race
21   discrimination.  Gray concluded that Achenbach had a business
22   reason for disciplining plaintiff on October 2, 2009, and did not
23   do so on account of plaintiff's race.  Gray sent plaintiff a letter
24   dated November 19, 2009, detailing these conclusions.  <u>See</u> Deft
25   Exh. 4 at pp. 1-4 (Gray's interview notes, conclusion, recommended
26   actions); Deft Exh. 4 at p. 5 (notes by Gray of meeting with
27   Kincaid and plaintiff on October 30, 2009); Deft Exh. 4 at p. 9
28   (Nov. 19, 2009 letter to Campbell).

1    During this investigation, Denni Christler, a co-worker of
2    plaintiff's at the Linnton site, stated that she did not think
3    plaintiff was late on October 2, 2009, and that she had noticed
4    that Achenbach treated plaintiff differently than other drivers..
5    Deft Exh. 4 at p. 1.  However, she also had never heard any direct
6    comments from Achenbach regarding plaintiff.   Id.

7    In his deposition, Castillo stated that he thought plaintiff
8    was sometimes singled out for punishment, "towards the end."
9    Castillo Depo. at pp. 21-22.  In an undated letter addressed "To
10   Whom It May Concern," Castillo wrote that he had witnessed
11   unfairness by Achenbach with drivers, but "more of the minorities
12   and Jarvis Campbell." Pltf Exh. 9 at p. 21.  He stated that "I
13   witnessed one day Kermit told drivers [that whoever] was late would
14   go to the bottom of the list, but it only happened to Jarvis and
15   not to other drivers that were late."  Id.  In his October 2009
16   interview with Gray, however, Castillo stated that Achenbach had
17   "problems with most drivers." Deft Exh. 4 at p. 1.  Castillo never
18   heard Achenbach say anything directly racist to plaintiff, although
19   he did make a racial comment to Castillo, but then apologized.  Id.

20   In his declaration submitted in response to the summary
21   judgment motion, plaintiff states that after he complained about
22   race discrimination to defendant, he was retaliated against by
23   defendant's management employees. Pltf Declr. at ¶ 3. He states
24   that during the investigation, Gray said, "you have not been a good
25   worker so why are you complaining," to which plaintiff responded
26   that he had "met expectations" for four years of performance
27   reviews and it was only after his complaint that he was told he was
28   not a good worker.  Id.  Additionally, according to plaintiff,

8 - OPINION & ORDER

1  someone named Chuck Gilbert told plaintiff he (plaintiff) had a
2  "target on my back," and that plaintiff needed to get it off his
3  back.  Id.  Gilbert would then threaten to write plaintiff up or
4  terminate him constantly after his complaint.  Id.   Plaintiff
5  further states that on November 19, 2009, Gray drafted a warning
6  stating that any one who was late to work would be disciplined.
7  Id. at ¶ 4.  But, during the next several weeks between the time of
8  the warning and "January 2010," Nontavarnit, Solimine, and Mikkotis
9  were anywhere from fifteen to thirty minutes late and were not
10 disciplined.  Id.

11     Finally, plaintiff states that he continued to be treated
12 differently than similarly situated Caucasian drivers.  Id. at ¶ 5.
13 He states he was disciplined or threatened for not keeping his
14 vehicle clean, even though other drivers' trucks were just as
15 dirty, if not more so, than his.  Id.  Gilbert would send less
16 senior, Caucasian drivers home before plaintiff, even though he had
17 the most seniority as the number one driver.  Id.

18     Plaintiff filed an Equal Employment Opportunity Commission
19 (EEOC) discrimination charge on February 16, 2010.  On March 31,
20 2010, the EEOC issued a right to sue notice.  Defendant terminated
21 plaintiff's employment on August 12, 2010, although the termination
22 is not part of this lawsuit.

23                            STANDARDS

24     Summary judgment is appropriate if there is no genuine issue
25 of material fact and the moving party is entitled to judgment as a
26 matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the
27 initial responsibility of informing the court of the basis of its
28 motion, and identifying those portions of "'pleadings, depositions,

9 - OPINION & ORDER

answers to interrogatories, and admissions on file, together with
the affidavits, if any,' which it believes demonstrate the absence
of a genuine issue of material fact." Chelates Corp. v. Citrate,
477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the
absence of a material and triable issue of fact,' 'the burden then
moves to the opposing party, who must present significant probative
evidence tending to support its claim or defense.'" Intel Corp. v.
Hartford Accident & Index. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)
(quoting Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th
Cir. 1987)). The nonmoving party must go beyond the pleadings and
designate facts showing an issue for trial. Chelates, 477 U.S. at
322-23.

The substantive law governing a claim determines whether a
fact is material. T.W. Elec. Serv. v. Pacific Elec. Contractors
Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as
to the existence of a genuine issue of fact must be resolved
against the moving party. Matsushita Elec. Indus. Co. v. Zenith
Radio, 475 U.S. 574, 587 (1986). The court should view inferences
drawn from the facts in the light most favorable to the nonmoving
party. T.W. Elec. Serv., 809 F.2d at 630-31.

If the factual context makes the nonmoving party's claim as to
the existence of a material issue of fact implausible, that party
must come forward with more persuasive evidence to support his
claim than would otherwise be necessary. Id.; In re Agricultural
Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);
California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,
Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

10 - OPINION & ORDER

1                                DISCUSSION

2          Plaintiff brings four claims:  three employment discrimination

3     claims and an intentional infliction of emotional distress (IIED)

4     claim.

5     I.  Employment Claims

6          The Title VII, O.R.S. 659A.030, and section 1981 claims all

7     have three components:  disparate treatment, hostile environment,

8     and retaliation.  The substantive analysis for all three components

9     under the three statutes is the same.  <u>Manatt v. Bank of America,</u>

10    <u>NA</u>, 339 F.3d 792, 797 (9th Cir. 2003) (the "legal principles

11    guiding a court in a Title VII dispute apply with equal force in a

12    § 1981 action"); <u>Reid v. Evergreen Aviation Ground Logistics</u>

13    <u>Enters., Inc.</u>, No. CV-07-1641-AC, 2009 WL 136019, at *7 (D. Or.

14    Jan. 20, 2009) (standard for establishing a prima facie case of

15    discrimination under O.R.S. 659A.030 is identical to that used to

16    establish a prima facie case of discrimination under Title VII);

17    <u>Friday v. City of Portland</u>, No. CV-00-278-JE, 2005 WL 189717, at *9

18    (D. Or. Jan. 26, 2005) (standards for state law hostile environment

19    claims parallel those for a Title VII claim) (citing <u>Jaurrieta v.</u>

20    <u>Portland Pub. Schs.</u>, No. CV-00-1238-ST, 2001 WL 34041143, at *7 &

21    n. 12 (D. Or. Dec. 14, 2001) (analyzing hostile environment claim

22    under O.R.S. 659.030 using Title VII standards and noting that

23    Oregon courts follow the reasoning of federal decisions on Title

24    VII), adopted (D. Or. Feb. 7, 2002)); <u>Logan v. West Coast Benson</u>

25    <u>Hotel</u>, 981 F. Supp. 1301, 1319 (D. Or. 1997) (in analyzing Oregon

26    discrimination claims under O.R.S. Chapter 659, Oregon courts have

27    looked to Title VII cases for guidance because Oregon statutes are

28    "wholly integrated and related" to Title VII); <u>see</u> <u>also</u> <u>Pool v.</u>

11 - OPINION & ORDER

1  VanRheen, 297 F.3d 899, 910 (9th Cir. 2002) ("Or. Rev. Stat. §
2  659A.030 was modeled after Title VII of the Civil Rights Act, 42
3  U.S.C. § 2000e-3 (a), which prohibits similar conduct.").

4      A plaintiff may prevail on summary judgment by providing
5  direct evidence of discrimination or by relying on circumstantial
6  or indirect evidence and satisfying the burden-shifting framework
7  of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas
8  Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).
9  See Cornwell v. Electra Cent. Credit Un., 439 F.3d 1018, 1028-30
10  (9th Cir. 2006).

11      The burden-shifting framework requires the plaintiff to
12  establish a prima facie case of unlawful discrimination followed by
13  the defendant articulating a legitimate, nondiscriminatory reason
14  for its action. McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122
15  n. 16 (9th Cir. 2004). If the defendant does so, the plaintiff
16  must show that the articulated reason is a pretext for
17  discrimination. Id.; Aragon v. Republic Silver State Disposal,
18  Inc., 292 F.3d 654, 658-59 (9th Cir. 2002).

19      Additionally, the Ninth Circuit recently confirmed that the
20  burden-shifting framework of McDonnell Douglas applies to O.R.S.
21  659A.030 claims tried in federal court, regardless of whether
22  federal jurisdiction is based on diversity or supplemental
23  jurisdiction. Dawson v. Entek Int'l, No. 09-35844, 2011 WL 61645,
24  at *4 (9th Cir. Jan. 10, 2011) (noting that Snead v. Metropolitan
25  Prop. & Cas. Ins. Co., 237 F.3d 1080, 1090-93 (9th Cir. 2001),
26  which held that McDonnell Douglas burden shifting, and not Oregon's
27  "prima-facie only" rule, applies to Oregon Chapter 659A claims in
28  federal court in diversity cases, "represents the law of this

12 - OPINION & ORDER

1   circuit and applies in all cases in federal district court in which
2   the choice between federal and state procedural law is presented.
3   The answer to the question whether federal procedural law must be
4   applied is the same regardless of the source of the federal court's
5   subject matter jurisdiction over a claim.").

6        A.  Statutes of Limitations

7        The Title VII claim requires that a charge be filed with the
8   EEOC within 180 days of the alleged unlawful employment practice.
9   42 U.S.C. § 2000e-5(e)(1).  Plaintiff filed his charge on February
10  16, 2010, which allows him to base his Title VII claim on events
11  occurring within 180 days of that date, or August 20, 2009, absent
12  application of the continuing violation doctrine in the context of
13  the hostile environment claim.

14       On the O.R.S. 659A.030 claim, plaintiff is required to file
15  his action within one year after the alleged unlawful employment
16  practice, unless he timely filed a complaint with Oregon's Bureau
17  of Labor and Industries (BOLI), in which case the statute of
18  limitations is extended until after BOLI's jurisdiction over the
19  matter ends.  O.R.S. 659A.875.  Although plaintiff filed an EEOC
20  charge, he did not file a complaint with BOLI alleging a violation
21  of Oregon law.  Thus, he may base his Oregon claim on events
22  occurring on February 5, 2009, or later, absent application of the
23  continuing violation doctrine.

24       The statute of limitations for the section 1981 claim is four
25  years.  Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83
26  (2004); Thinket Ink Info. Resources, Inc. v. Sun Microsystems,
27  Inc., 368 F.3d 1053, 1060-61 (9th Cir. 1004); 28 U.S.C. § 1658.
28

1  Thus, any events occurring February 5, 2006[2], or later, may be used
2  to support this claim.

3      B.  Disparate Treatment Claim

4      To establish a prima facie case of race discrimination,
5  plaintiff must show (1) that he is African-American; (2) that he
6  performed his job adequately; (3) that he suffered an adverse
7  employment action; and (4) that similarly situated individuals
8  outside his protected class were treated differently.  Cornwell,
9  439 F.3d at 1031.

10     Defendant does not challenge that plaintiff belongs to a
11 protected class and was qualified for his position.  Defendant
12 contests whether plaintiff was subject to an adverse employment
13 action, or in one instance, whether plaintiff shows he was
14 similarly situated to other co-workers.

15     In his memorandum in opposition to the summary judgment
16 motion, plaintiff appears to raise four discrete adverse employment
17 actions taken against him:  (1) being subjected to habitual
18 harassment and discrimination by Achenbach because of his race; (2)
19 working in conditions where he was subjected to racial slurs by his
20 co-workers; (3) awareness by human resources staff and management
21 of the slurs and harassment, but allowing the atmosphere of racial
22 harassment to continue; and (4) being treated differently than non-
23 African-American co-workers.  Pltf Resp. Mem. at p. 10.

24     I agree with defendant that the first three are not cognizable
25 as adverse employment actions.    For the purposes of a

26

27
        [2]  The case was filed in state court on February 5, 2010,
28 and later removed to this Court by defendant.

14 - OPINION & ORDER

discrimination claim, an adverse employment action is one which "materially affects the compensation, terms, conditions, or privileges of employment." Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation, brackets, and ellipsis omitted); see also Kang v. U. Lim Am., Inc., 296 F.3d 810, 818-19 (9th Cir. 2002) (plaintiff established a prima facie case of disparate treatment where the defendant subjected the plaintiff to adverse employment actions including discriminatory overtime, and termination, "that constituted a material change in the terms and conditions of [the plaintiff's] employment") (internal quotation omitted); Chuang v. University of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1126 (9th Cir. 2000) (finding that "[t]he removal of or substantial interference with work facilities important to the performance of the job constitutes a material change in the terms and conditions of a person's employment" and therefore qualifies as an adverse employment action, but also finding that the employer's failure to respond to grievances did not amount to an adverse employment action because "it did not materially affect the compensation, terms, conditions, or privileges of the [plaintiffs'] employment"); Kortan v. California Youth Auth., 217 F.3d 1104, 1113 (9th Cir. 2000) (no adverse employment action when the plaintiff was not demoted, not stripped of work responsibilities, not handed different or more burdensome work activities, not fired or suspended, not denied any raises, and not reduced in salary or any other benefit); Campos v. Portland Public Schs., No. 99-1744-MA, 2000 U.S. Dist. Lexis 21617, at *16-17 (D. Or. Nov. 9, 2000) (no adverse employment action when plaintiff's job demotion was not accompanied by any salary or status change or any indication that

1    her new position was less favorable).

2        I agree with defendant that the first three alleged adverse
3    employment actions listed by plaintiff are part of the hostile
4    environment claim because habitual harassment by Achenbach, being
5    subjected to racial slurs and harassment by co-workers, and
6    management's failure to do anything to address the situation are
7    not discrete acts and do not, without more, materially affect the
8    compensation, terms, conditions, or privileges of plaintiff's
9    employment in a tangible way.

10       As for being treated differently, the alleged adverse
11   employment actions plaintiff relies on are:  (1) failing to ask
12   plaintiff, before asking drivers with less seniority than
13   plaintiff, if he wanted to go home first; (2) failing to ask
14   plaintiff if he wanted a newer truck before asking drivers with
15   less seniority; (3) failing to be assigned the "back up batch
16   operator" position when it was assigned to Nontavarnit who had less
17   seniority; (4) being disciplined in September 2007 for being late
18   when other drivers were not disciplined for tardiness; and (5)
19   being sent home for two days in October 2009.  Pltf Resp. Mem. at
20   pp. 12-17.

21            1.  Allowing Less Senior Drivers to Leave Earlier

22       Defendant argues that this alleged adverse employment action
23   is not actionable in the Title VII or O.R.S. Chapter 659A claims
24   because the record fails to show that this practice of Achenbach's
25   continued after November 2008 when Achenbach was moved to a
26   dispatcher position at defendant's Metro Office and no longer
27   worked at Linnton.  Pltf Depo. at p. 189 (Achenbach moved to Metro
28   office in November 2008 and plaintiff had no contact with him after

16 - OPINION & ORDER

that date).  As noted above, for the Title VII claim, the action must have occurred after August 20, 2009 (180 days before the EEOC complaint), and for the O.R.S. Chapter 659 claim, the action must have occurred after February 5, 2009.  Because Achenbach's alleged discriminatory treatment of plaintiff in failing to ask him about going home, before asking less senior employees, ended before either of those dates, these are not actionable adverse employment actions for the Title VII and O.R.S. 659A.030 claims.

However, because the section 1981 claim goes back to February 5, 2006, defendant also argues that regardless of the timeliness, the failure to allow plaintiff to go home sooner than other employees did not affect plaintiff's compensation or otherwise impact his employment and thus, there was no adverse employment action.  Plaintiff admitted that he suffered no economic loss and likely earned more money as a result of Achenbach's failure to ask him if he wanted to go home.  Pltf Depo. at pp. 109-10.

This practice by Achenbach does not qualify as an adverse employment action.  See, e.g., Burlington Indus, Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

While the definition of adverse employment action is not limited to actions which affect only compensation, here, there was no change in employment status, no different job responsibilities, and no change in benefits.  Accordingly, this conduct cannot support plaintiff's disparate treatment claim.

17 - OPINION & ORDER

1                 2.   Assignment of Trucks

2          The failures to assign a newer truck to plaintiff in June 2007

3    and March 2008 are time barred for both the Title VII and O.R.S.

4    Chapter 659 claims.  These are actionable, however, for the section

5    1981 claim.

6          Defendant argues that plaintiff suffered no adverse employment

7    action.  I agree.  Plaintiff did not want either of the trucks in

8    question and preferred to keep his own manual transmission truck.

9    His only issue is that he was not asked.  Plaintiff cites no cases

10   in  support  of  his  argument  that  failing  to  be  offered  an

11   alternative piece of equipment, which he did not want anyway and

12   would have turned down if asked, is an adverse employment action.

13   Feeling slighted or insulted is not enough to constitute an adverse

14   employment action in the context of a disparate treatment claim.

15   See Czekalski v. LaHood, 589 F.3d 449, 454 n.3 (D.C. Cir. 2009)

16   (approving use of a jury instruction defining adverse employment

17   action which stated, inter alia, that an "employer's decision that

18   does not have a tangible effect on an employee does not qualify as

19   an adverse action, even if the employee considers it insulting or

20   offensive.").

21                 3.   Back-Up Batch Operator Assignment

22         This  event  occurred  in  August  2007  when  Nontavarnit  was

23   assigned as the back-up batch operator instead of plaintiff.  The

24   timeliness issues in regard to the Title VII and O.R.S. Chapter 659

25   claim apply to this incident.  The event is timely only for the

26   section 1981 claim.

27         Defendant contends that the failure to ask plaintiff if he was

28   interested in being the back-up batch operator is not an adverse

18 - OPINION & ORDER

employment action.  It is undisputed that even if plaintiff had
been offered this position, he would have batched ready mix for the
trucks only when Achenbach was unavailable to do so.  Pltf Depo. at
pp. 174-77.  There is no evidence in the record regarding how often
this would have occurred.

It is also undisputed that the assignment as the back-up batch
operator would not have resulted in any increase in pay or fringe
benefits for plaintiff.  Id. at pp. 179-80.  And while plaintiff
stated something in deposition to that effect that he was intrigued
by learning about the batch operator position and that "hopefully,
[he would then] get [his] degree in business administration with
the prospects of moving up throughout the company," he also stated
that by the time this event occurred, he had decided that he did
not want to work for the company anymore.  Id. at p. 180.

Moreover, plaintiff does not dispute that assignment to the
back-up batch operator position required working longer hours on
occasion.  It is hard to reconcile plaintiff's desire for the batch
operator position with his complaint that Achenbach should have
been asking plaintiff if he wanted to leave earlier than less
senior employees.  As with the prior alleged adverse employment
action regarding the trucks, feeling slighted or insulted, without
an accompanying material change to the terms, conditions,
compensation or privileges of his employment, is not an adverse
employment action in the context of a disparate treatment claim.

4.  September 2007 Discipline for Tardiness

Plaintiff contends that his September 2007 discipline for
being tardy is an example of being treated differently than
similarly-situated non-African-American employees.  This incident

19 - OPINION & ORDER

1   is beyond the limitations period and is not actionable for the
2   Title VII and O.R.S. Chapter 659 claims.  It remains timely for the
3   section 1981 claim.

4       Defendant argues that the evidence, even when viewed in a
5   light most favorable to plaintiff, is insufficient to show that
6   plaintiff was similarly situated to non-African-American
7   individuals who were treated more favorably.  Defendant notes that
8   plaintiff lists other truck drivers who were tardy from time to
9   time during plaintiff's employment with defendant.  E.g., Pltf
10  Depo. at pp. 83, 85-86.  But, defendant argues, other than the fact
11  that these other employees were also ready mix drivers, plaintiff
12  does not show that they had been repeatedly tardy, had been
13  previously personally counseled about tardiness by Dumolt and
14  Kincaid, or had a prior track record of discipline.

15      In the September 13, 2007 written warning plaintiff received
16  as a result of his alleged tardiness on September 7, 2007, Kincaid
17  noted that the reported September 7, 2007 tardiness was not
18  plaintiff's first tardy and that he had been previously tardy under
19  both Dumolt's and Achenbach's supervision.  Pltf Exh. 9 at p. 12.
20  Additionally, Dumolt, Kincaid, and plaintiff had previously met and
21  talked about the tardy problem and they had explained to plaintiff
22  how important it was to report to work on time.  Id.  Kincaid also
23  noted that plaintiff had been reprimanded and issued both an oral
24  warning on April 24, 2006, and a written warning on December 15,
25  2006, for equipment damage.  Id.  Kincaid explained that this
26  "translates to me, your manager[,] as a lack of focus on
27  performance of your duties in a safe and timely manner."  Id.

28      I agree with defendant that the record fails to show that any

20 - OPINION & ORDER

of the other employees plaintiff names who were allegedly tardy and not disciplined for it, had the disciplinary history that plaintiff had at the time of the September 2007 suspension and written warning. Generally, "individuals are similarly situated when they have similar jobs and display similar conduct." Hawn v. Executive Jet Mgmt, Inc., 615 F.3d 1151, 1157 (9th Cir. 2010) (internal quotation omitted).

An employee's disciplinary history is relevant in assessing the "similarly situated" factor, especially when the plaintiff's claim is that he or she has been disciplined unfairly. See, e.g., Amrhein v. Health Care Serv. Corp., 546 F.3d 854, 860 (7th Cir. 2008) (co-workers who did not have similar disciplinary history could not be considered "similarly situated" for prima facie case); Peele v. Country Mut. Ins. Co., 288 F.3d 319, 330 (7th Cir. 2002) ("in disciplinary cases-in which a plaintiff claims that [she] was disciplined by [her] employer more harshly than a similarly situated employee based on some prohibited reason- a plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct. . . . This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (internal quotation and emphasis omitted); Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691-92 (8th Cir. 2002) (plaintiff failed to present evidence of similarly situated co-worker when plaintiff did not show that co-worker had comparable disciplinary history).

Without evidence of a similar discipline history for

21 - OPINION & ORDER

1   tardiness, and an overall similar disciplinary history, for
2   plaintiff's non-African-American comparators, plaintiff fails to
3   create an issue of fact regarding his being similarly situated to
4   these other employees.   Thus, this event cannot support his
5   disparate treatment claim.

6          5.  October 2009 Suspension
7          This incident, in which Achenbach sent plaintiff home and told
8   him to stay home for the next day, is timely for all three claims -
9   Title VII, O.R.S. Chapter 659, and Section 1981.

10         Defendant contends there is no adverse employment action
11  because of Gray's later actions in disciplining Achenbach and
12  paying plaintiff for the time missed.  Because plaintiff was paid
13  for the time missed, defendant contends there was no "significant
14  change in employment status, such as hiring, firing, failure to
15  promote, reassignment with significantly different
16  responsibilities, or a decision causing a significant change in
17  benefits" required to find an adverse employment action.  Ellerth,
18  524 U.S. at 761.   Plaintiff argues that just because he was
19  compensated for the time does not negate the earlier wrongful
20  suspension which is clearly an adverse employment action.

21         Although neither party cites any cases directly on point, I
22  conclude that the adverse nature of the suspension does not
23  completely evaporate with the restoration of pay.  In a somewhat
24  analogous case, an employee was initially suspended for an
25  incident, but the suspension was later reduced to a warning letter.
26  Fonseca v. Sysco Food Servs. of Az., Inc., 374 F.3d 840, 848 (9th
27  Cir. 2004).  The Ninth Circuit held that the "warning letter still
28  constitutes an adverse employment action, particularly since Sysco

22 - OPINION & ORDER

1  publicizes all discipline to all its employees."  Id.

2      Here, while plaintiff was made whole in the sense that he
3  received all the compensation that he was entitled to for the
4  missed days, and, in contrast to Fonseca, the discipline was not
5  simply reduced but eradicated, the stigma and adverse nature of
6  Achenbach's actions remain, especially absent any evidence that
7  other employees were told about the restoration of pay to plaintiff
8  and the later discipline of Achenbach.  On this record, there is
9  sufficient evidence that the October 2009 incident is an adverse
10  employment action.

11      In summary on the disparate treatment claim, I deny the motion
12  on all aspects of the claim except for the October 2009 suspension.

13      C.  Hostile Environment Claim

14      To establish a prima facie case for a hostile work environment
15  claim, plaintiff "must raise a triable issue of fact as to whether
16  (1) the defendants subjected [him] to verbal or physical conduct
17  based on [his] race; (2) the conduct was unwelcome; and (3) the
18  conduct was sufficiently severe or pervasive to alter the
19  conditions of [his] employment and create an abusive working
20  environment."  Surrell v. California Water Serv. Co., 518 F.3d
21  1097, 1108 (9th Cir. 2008).

22      Defendant challenges the third factor - whether the evidence,
23  viewed in a light most favorable to plaintiff, establishes that the
24  conduct was sufficiently severe or pervasive to be actionable as a
25  hostile environment.  Plaintiff relies on evidence of racial slurs
26  used at Linnton, as well as the evidence recited above in
27  connection with the disparate treatment claim, to argue that the
28  racial hostility at Linnton site was sufficiently severe to support

23 - OPINION & ORDER

1  a hostile environment claim.  I agree with plaintiff.

2       As for the racial slurs, the record shows that in December

3  2007, Castillo told plaintiff that sometime in October or November,

4  he heard Achenbach refer to plaintiff as a "stupid fucking nigger,"

5  in regard to a problem plaintiff had in backing up a truck.

6       In July 2008, plaintiff observed the Obama pictures in the

7  office.   In September 2009, Erwin used the term "nigger-rigged" in

8  plaintiff's presence.

9       While many of the facts plaintiff relies on in support of his

10 disparate treatment claim are not sufficient to establish an

11 adverse employment action, they are relevant to the hostile

12 environment claim.[3] For example, the evidence, when viewed in a

13 light most favorable to plaintiff, is capable of showing that

14 defendant awarded certain favorable treatment to drivers less

15 senior than plaintiff, when the established practice at Linnton was

16 to offer these benefits to more senior drivers first.   This

17

18      [3] As with the disparate treatment claim, some incidents
   plaintiff relies on in support of the hostile environment claim
19 are time barred for purposes of the Title VII and O.R.S. Chapter
   659A claims.  Because none are barred for the section 1981 claim,
20 I discuss all of the relevant facts, whether time barred for the
   other claims or not.  Moreover, in contrast to the disparate
21 treatment or retaliation claims, the continuing violation theory
   may apply in the hostile environment claim to make all alleged
22 conduct actionable, National Railroad Passenger Corp. v. Morgan,
23 536 U.S. 101, 115-18 (2002), and if not, evidence of the stale
   incidents may still be relevant and admissible to place the
24 timely conduct in context.  E.g., Picouto v. Western Star Truck
   Plant Portland LLC, No. CV-08-807-ST, 2010 WL 3607956, at *25 (D.
25 Or. May 27, 2010) (in race, national origin, and gender
   discrimination claim, discrete acts occurring more than one year
26 prior to the filing of an administrative agency charge of
   discrimination, were time barred, but could still be considered
27 for "purposes of placing non-discrete acts in the proper
   context"), adopted (D. Or. Sept. 13, 2010).
28

includes Achenbach's failure to ask plaintiff if he wanted to go home early and not being asked if he wanted the newer truck on two occasions. Even if plaintiff did not ultimately want the newer automatic transmission truck, he does present evidence to show that the expectation in the workplace at Linnton was that being offered the truck, or the opportunity to go home early, was something afforded to the more senior driver. There is no dispute that he was more senior to others who were offered these opportunities.

As for the tardiness issue, while plaintiff was suspended twice for tardiness (although the October 2009 suspension was rescinded and the pay restored), the record suggests that many drivers were also late, yet none of them received suspensions. E.g., Pltf Exh. 9 at p.21 (Castillo witnessed Achenbach put plaintiff at the bottom of the list for being late, but not other drivers); Pltf Depo. at p. 83 (plaintiff testified that several other named employees were late, but were not reported for being late and not sent home); Deft Exh. 4 at p. 1 (Denni Christler told Gray in his investigation of the October 2009 suspension that she did not think plaintiff was late on October 2, 2009, and that she had noticed that Achenbach treated plaintiff differently than other drivers).

Overall, the evidence sufficiently supports a hostile environment claim. Although the use of the word "nigger" was never actually directed at plaintiff, plaintiff learned that Achenbach had called him a "stupid fucking nigger," and Erwin used the term "nigger-rigged" in his presence. The use of the word "nigger" is especially offensive. E.g., Swinton v. Potomac Corp., 270 F.3d 794, 817 (9th Cir. 2001) (the word "nigger" is "perhaps the most

25 - OPINION & ORDER

offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry") (internal quotation omitted); Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 356 (8th Cir. 1997) (the "use of the word 'nigger,' even in jest, can be evidence of racial antipathy") (internal quotation omitted); McGinest, 360 F.3d at 1116 ("It is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination").

Additionally, plaintiff witnessed the disparaging pictures of Obama, and he has created an issue of fact as to whether he was treated differently than non-African-American employees in certain aspects of his job. The combination of the racial slurs and disparate treatment is enough to deny summary judgment to defendant on the hostile environment claim.

D. Retaliation Claim

To establish a prima facie case of retaliation, plaintiff must prove (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the two. Surrell, 518 F.3d at 1109. Once established, the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions. Id. At that point, the plaintiff must produce evidence to show that the stated reasons were a pretext for retaliation. Id.

The definition of an adverse employment action for the purposes of a retaliation claim is broader than that for a disparate treatment discrimination claim. Burlington N. & Santa Fe Rwy Co. v. White, 546 U.S. 53, 60-63 (2006) (anti-retaliation

26 - OPINION & ORDER

1  provision of Title VII, unlike the substantive provision, is not
2  limited to discriminatory actions that affect the terms and
3  conditions of employment; defining adverse employment action for
4  purposes of retaliation claims as an action that a reasonable
5  employee would have found materially adverse, meaning action that
6  "might have dissuaded a reasonable worker from making or supporting
7  a charge of discrimination"); see also Ray v. Henderson, 217 F.3d
8  1234, 1243 (9th Cir. 2000) (employment action is adverse in
9  retaliation claim if it is "reasonably likely to deter employees
10 from engaging in protected activity").

11      Generally, plaintiff contends that defendant treated him less
12 favorably than non-African-American employees following his October
13 2009 complaint of race discrimination.  In his response to the
14 summary judgment motion, plaintiff cites to a series of discrete
15 events occurring in the weeks after his complaint and argues that
16 these events "tend[] to show that management began taking steps to
17 put Plaintiff in a position where he could be disciplined or
18 terminated.  Additionally, the fact that Defendant was being
19 hypercritical of Plaintiff's tardies and absences after the formal
20 complaint, but not in his performance evaluation before the
21 complaint, is evidence of retaliation."  Pltf Res. Mem. at pp. 25-
22 26.

23      The first action plaintiff mentions is a comment by Gray
24 during the investigation of plaintiff's complaint where Gray
25 allegedly said, "you have not been a good worker so why are you
26 complaining?"  Plaintiff suggests that this was actionable
27 retaliatory conduct because before making his racial harassment
28 complaint, he performed his job adequately as seen in his several

27 - OPINION & ORDER

"meets expectations" performance evaluations.[4]  I disagree. Even under the broad definition of adverse employment action used in retaliation claims, Gray's comment is not an adverse employment action.

Next, plaintiff notes that shortly after he made his racial discrimination complaint, someone created, for Gray, a document of plaintiff's absences and tardies for 2009, including sick time and vacation time. Pltf Exh. 9 at p. 9.  In his deposition, Gray explained that Kincaid likely made the document for Gray to determine if there was a pattern of tardiness and absenteeism with plaintiff. Gray Depo. at p. 27.  Gray explained that he believed the document was put together for him when he was doing his investigation of Achenbach having sent plaintiff home on October 2, 2009, because Achenbach said plaintiff was tardy.  Id.  No similar document was made regarding other employees.  Id.

Notably, there is nothing in the record to show that plaintiff was aware of this document anytime before the lawsuit.  Thus, it is

_____

[4]   While plaintiff was usually rated "meets expectations," it was not 100% of the time.  In May 2006, he was rated as "below expectations" as to "housekeeping," with the comment that the truck was very dirty outside and plaintiff was working on cleaning it up and doing a better job of keeping in clean.  Pltf Exh. 9 at p. 26.  In January 2007, a comment was made that he needed to be reminded to slow down and complete all tasks, particularly paperwork.  Id. at p. 27.  In January 2008, he was rated as "needs improvement" in the section for "quality" for the task of needing to be reminded to make products within specifications or to follow appropriate processes/procedures.  Id. at p. 28.  The listed goal was to improve in all aspects of the job, even the small details.  Id. at p. 28.  In January 2009, the comment was made that he needed to clean his truck and remove all concrete on the back of the truck, and to clean the cab of his truck.  Id. at p. 29.

28 - OPINION & ORDER

impossible to conclude that this particular employer conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."    It does not support a retaliation claim.

Next, plaintiff contends that defendant harassed him, and not other non-African-American employees about being tardy, even after defendant apparently warned all employees that failure to be on time, complete the pre-trip inspection, and file the appropriate pre-trip paperwork, would result in discipline.    In his declaration, plaintiff states that on November 19, 2009, Gray drafted a final warning stating that any one who was late to work would be disciplined.  Pltf Declr. at ¶ 4.[5]  Plaintiff states that between the time of Gray's November 19, 2009 warning letter, and January 2010, Nontavarnit, Solimine, and Mikkotis, were late to work, but were not disciplined.  Pltf Declr. at ¶ 4.  Even though defendant knew employees were continuing to show up late, defendant did not address it.  Id.  But, according to plaintiff, defendant continued to harass plaintiff about being late, even though he was not tardy.  Id.  He explains that "[a]fter I complained[,] all the focus was on me and Defendant's management level employees were

---

[5]  No such specifically identified written warning, letter, or memorandum appears to be in the record.  Presumably, plaintiff refers here to the November 19, 2009 letter Gray sent to plaintiff explaining the results of his investigation into the October 2, 2009 suspension of plaintiff by Achenbach, and into plaintiff's race discrimination complaints.  See Deft Exh. 4 at p. 9.  In that letter to plaintiff, Gray stated that "[i]t is important and required that all drivers be on time, do a complete pre-trip inspection and file the appropriate paperwork.  We are notifying all drivers that, from now on, they must meet these requirements or they can expect discipline to follow."  Id.

29 - OPINION & ORDER

1  waiting for me to make any little mistake so they could terminate
2  my employment." Id.

3      Plaintiff also states that he was disciplined or threatened
4  for not keeping his vehicle clean, even though other drivers'
5  trucks were just as dirty, if not more so, than his. Id. at ¶ 5.
6  And, less senior, Caucasian drivers were sent home before him, even
7  though he had the most seniority.   Id.

8      Even under the broad definition of adverse employment action
9  used in retaliation claims, plaintiff fails to show sufficient
10 evidence of the requisite adverse action, or create an issue of
11 fact as to the adverse action, to support the claim.  In regard to
12 the tardiness issue, plaintiff does name three other employees who
13 allegedly received more favorable treatment.   But, in his
14 description of the issue in paragraph four of his declaration, he
15 gives absolutely no details regarding how he was allegedly
16 harassed, including anything that was said or done to him that was
17 not said or done to the other employees, to show that he actually
18 suffered any type of adverse action or to show that a reasonable
19 employee would have been dissuaded from making a complaint as a
20 result of the alleged vague "harassment" of which he complains.

21     Additionally, as to the less senior drivers being sent home
22 earlier, this conduct cannot be said to have been initiated in
23 retaliation for plaintiff's October 2009 race discrimination
24 complaint because, according to plaintiff, Achenbach started this
25 practice in the spring of 2007.  Thus, there is a lack of causation
26 to support this conduct being retaliatory.  As to the allegations
27 regarding the dirty truck, because plaintiff's performance reviews
28 noted his dirty truck on more than one occasion before his October

30 - OPINION & ORDER

2009 race discrimination complaint, he fails to show causation. Pltf Exh. 9 at pp. 26, 29.  Additionally, while he states that he was threatened or disciplined for having a dirty truck after the October 2009 complaint, he provides no information regarding how he was threatened or disciplined and thus, fails to create an issue of fact as to whether a reasonable employee would be dissuaded from making a discrimination complaint as a result of such actions. There is no supporting evidence in the record to show that plaintiff received any warnings or discipline regarding a dirty truck after he made his racial discrimination complaint in October 2009.

I grant summary judgment to defendant on the retaliation claim.

II.  IIED Claim

To sustain an IIED claim, plaintiff must show that defendant intended to inflict severe emotional distress, that defendant's acts were the cause of plaintiff's severe emotional distress, and that defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.  McGanty v. Staudenraus, 321 Or. 532, 563, 901 P.2d 841, 849 (1995); see also Babick v. Oregon Arena Corp., 333 Or. 401, 411, 40 P.3d 1059, 1063 (2002) (to state an IIED claim under Oregon law, plaintiff must prove, inter alia, that defendants' actions "constituted an extraordinary transgression of the bounds of socially tolerable conduct.") (internal quotation omitted).

The IIED claim has a two-year statute of limitations, making any incidents before February 5, 2008, not actionable.  Or. Rev. Stat. § 12.110(1).  As a result, Castillo's December 2007 report to

31 - OPINION & ORDER

1  plaintiff that in October or November 2007 he heard Achenbach refer
2  to plaintiff as a "stupid fucking nigger," cannot be a basis for
3  the IIED claim.

4      Other references to the word "nigger" are similarly outside
5  the limitations period, including the statements made by Grimmett
6  and plaintiff to Stevens in August 2007 that an unidentified person
7  told them that Robertson had referred to Grimmett as a lazy nigger.
8  And, while Grimmett testified that Branson told him that he
9  (Branson) had overheard Achenbach and Robertson use the word nigger
10 in reference to Grimmett and plaintiff, plaintiff does not
11 establish a time period for these comments.  Given that Robertson
12 was terminated in March 2008, and Grimmett was terminated in
13 November 2008, it is possible that Branson heard these comments and
14 told Grimmett about them, during the limitations period.
15 Nonetheless, they are not supportive of plaintiff's IIED claim
16 because there is no evidence in the record that Branson told
17 plaintiff, as opposed to Grimmett, about what he heard.  Further,
18 Robertson did not direct the comment directly to plaintiff.

19     The only actionable racial slur for purposes of the IIED claim
20 is Erwin's September 2009 comment about the equipment being
21 "nigger-rigged," for which she immediately apologized.

22     Plaintiff also argues that the evidence of disparate treatment
23 supports his IIED claim.  Given the statute of limitations, the
24 timely incidents are (1) less senior drivers being asked before
25 plaintiff if they wanted to go home first (this conduct apparently
26 continued from spring 2007 into the limitations period); (2)
27 Robertson's truck being given to Mikkotis, a less senior driver
28 than plaintiff, in March 2008; and (3) plaintiff's suspension on

32 - OPINION & ORDER

1  October 2, 2009.  Finally, plaintiff argues that evidence shows
2  that Achenbach wanted to "get rid of" plaintiff.

3      Defendant argues that plaintiff fails to satisfy the "intent"
4  element of his IIED claim.  I agree with defendant.

5      Intent is defined to mean "where the actor desires to inflict
6  severe emotional distress, and also where he knows that such
7  distress is certain, or substantially certain, to result from his
8  conduct."  McGanty, 321 Or. at 550, 901 P.2d at 853 (internal
9  quotation and emphasis omitted).  Here, the single use of the term
10 "nigger-rigged" by Erwin, as offensive as that is, as a way of
11 describing a piece of malfunctioning equipment and not directed
12 personally at plaintiff, fails to show that defendant desired to
13 inflict severe emotional distress on plaintiff or was substantially
14 certain it would occur.

15     As to the other actions, even assuming for the purposes of
16 this Opinion that they were racially motivated, they expose
17 defendant as a poor employer who acted with an improper purpose.
18 But, not every employer action which is motivated by an improper
19 purpose establishes an IIED claim.  An intent to treat an employee
20 differently because of his race is not always synonymous with an
21 intent to cause that employee severe emotional distress.

22     Alternatively, even if plaintiff could establish the intent
23 element, the alleged disparate treatment of plaintiff in this case
24 is simply not so outrageous as to constitute an extraordinary
25 transgression of the bounds of socially tolerable conduct.  In
26 other cases analyzing an Oregon IIED claim where the use of racial
27 or sexual slurs has occurred, the comments have been directed at
28 the victim, and there has been other offensive conduct as well.

33 - OPINION & ORDER

1  E.g., Whelan v. Albertson's, Inc., 129 Or. App. 501, 504-06, 879
2  P.2d 888, 891 (1994) (plaintiff's supervisor and co-worker
3  repeatedly referred to plaintiff as "queer" and imitated his
4  allegedly effeminate characteristics in front of plaintiff and
5  other employees, plaintiff's supervisor asked plaintiff if he had
6  "fucked" a woman he dated, the plaintiff's co-worker called
7  plaintiff a "fucking queer asshole," and the co-worker shoved the
8  plaintiff hard in the chest, among other things); Lathrope-Olson v.
9  Department of Transp., 128 Or. App. 405, 408, 876 P.2d 345, 347
10 (1994) (when defendant's overtly racist and sexual comments were
11 directed to plaintiff and defendant engaged in other acts of
12 psychological and physical intimidation, summary judgment to
13 employer was improper); Franklin v. Portland Comm. College, 100 Or.
14 App. 465, 467, 469-72, 787 P.2d 489, 490, 491-83 (1990)
15 (supervisor's use of racial epithet "boy," directed to African-
16 American employee, along with issuing false reprimands, attempting
17 to lock him in an office, and suggesting that he apply for a
18 different job with another employer, were enough to show continual
19 verbal and physical harassment such that, if proven, the plaintiff
20 could show that the supervisor had the specific intent to cause the
21 plaintiff severe emotional distress).  Without more, plaintiff
22 fails to create an issue of fact on the intent or outrageous
23 elements of the IIED claim.

24     As to the other allegation regarding Achenbach's and
25 Robertson's desire to "get rid" of plaintiff, defendant initially
26 challenges the admissibility of the evidence supporting this
27 allegation, and then argues that even considering it, it does not
28 support plaintiff's claim.  I address the evidentiary objection in

34 - OPINION & ORDER

1  a separate section of this Opinion.  However, even considering the
2  evidence, I agree with defendant.

3     There are two pieces of evidence plaintiff relies on to
4  support his contention that Achenbach and Robertson wanted to get
5  rid of him because he is African-American.  First is an October 6,
6  2009 letter written by Robertson after his termination in which he
7  writes "To Whom it May Concern," and takes issue with Achenbach's
8  role as a supervisor.  Pltf Exh. 9 at pp. 3-4.  He states that
9  Achenbach "abused his position in the [company] against co-workers
10 under his supervision.  Id.  Robertson states that he could recall
11 "one specific incident, when [Achenbach] asked me to provoke other
12 co-workers of a specific race into losing their jobs."  Id.

13    The other piece of evidence is a statement by African-American
14 employee John Ratcliff during Stevens's investigation of
15 plaintiff's race discrimination complaint.  Ratcliff told Stevens
16 that Ratcliff had "NEVER heard [Achenbach] say anything
17 discriminatory 1st hand, but . . . Joe Robertson told [Ratcliff]
18 that [Achenbach] said that he wanted to get rid of [Grimmett]
19 first, [plaintiff] second, and [Ratcliff] third.  [Ratcliff] was
20 not sure that this was true, but it if was, it would be suspicious
21 since they were all three black."  Pltf Exh. 9 at pp. 7-8.

22    I note that first, neither piece of evidence implicates
23 Robertson as desiring to get rid of plaintiff, for any reason.  Any
24 ill motive is alleged to have been held by Achenbach only.  Second,
25 the evidence is that Achenbach shared certain feelings with
26 Robertson about a desire to get rid of certain employees.  Neither
27 statement attributed to Achenbach includes any overt racial
28 reference or slur, and, even if one can be inferred, the statements

35 - OPINION & ORDER

were not made directly to plaintiff.  Without more, the evidence is not capable of allowing a reasonable factfinder to conclude that Achenbach intended to cause plaintiff severe emotional distress or was certain, or substantially certain, such distress would occur because of Achenbach's conduct.

I grant summary judgment to defendant on the IIED claim.

III.  Evidentiary Objections

Defendant objects to the admission of Robertson's October 6, 2009 letter, and Ratcliff's statements to Stevens during her investigation of plaintiff's race harassment complaint.

I did not consider the evidence in regard to the employment claims, and even considering it as part of the IIED claim, I grant defendant's motion.   Thus, it is unnecessary to resolve the evidentiary objections.

However, I note that with both exhibits, plaintiff ultimately relies on Federal Rule of Evidence 801(d)(2)(D) to argue that the statements attributed to Achenbach by Robertson in his letter, or by Ratcliff in his statements to Stevens, are admissible as statements of a party's agent concerning a matter within the scope of the agency or employment, made during the existence of the employment relationship.

The proponent of allegedly non-hearsay evidence consisting of a statement by a party's agent, has the burden to demonstrate the foundational requirement that the statement related to a matter within the scope of the witness's agency or employment.  United States v. Chang, 207 F.3d 1169, 1176 (9th Cir. 2000).   Facts regarding the agent's duties are clearly relevant to the analysis. See, e.g., Sana v. Hawaiian Cruises, Ltd., 181 F.3d 1041, 1045-46

36 - OPINION & ORDER

1   (9th Cir. 1999) (analyzing facts regarding scope of agency); <u>City</u>
2   <u>of Long Beach v. Standard Oil Co. of Calif.</u>, 46 F.3d 929, 937 (9th
3   Cir. 1995) (affirming exclusion of agent's statements because of
4   proponent's failure to include in the record any evidence regarding
5   agent's role in company).

6       Here, plaintiff fails to a create a record supporting the
7   admission of Achenbach's statements under Rule 801(D)(2)(d).  There
8   is no evidence regarding Achenbach's job description, his actual
9   duties, or his authority to fire employees.  Without such
10  information, the record does not show that the statements
11  attributed to him concerned a matter within the scope of his
12  agency.

13                              CONCLUSION

14      Defendant's summary judgment motion [31] is granted in part
15  and denied in part as follows:  (1) on the disparate treatment
16  portion of the three employment claims brought under Title VII,
17  section 1981, and O.R.S. 659A.030, the motion is denied to the
18  extent the claims are based on the October 2009 suspension, and the
19  motion is granted on all other bases supporting the disparate
20  treatment claims; (2) the motion is denied as to the hostile
21  environment employment claims; (3) the motion is granted as to the
22  retaliation employment claims; and (4) the motion is granted as to
23  the IIED claim.

24      IT IS SO ORDERED.

25                  Dated this  8th   day of  March      , 2011

26

27                      ____/s/ Dennis James Hubel_____
                        Dennis James Hubel
28                      United States Magistrate Judge

37 - OPINION & ORDER